UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kevin T. Seldon,                                              Case No. 3:17-cv-0744

            Plaintiff,

    v.                                                        MEMORANDUM OPINION
                                                                                     AND ORDER

Jacobs Industrial Services, Inc.,

            Defendant.

## I.    INTRODUCTION

Before me is the motion of Defendant Jacobs Industrial Services, Inc., for summary judgment. (Doc. No. 14). Plaintiff Kevin T. Seldon filed a memorandum in opposition, (Doc. No. 16), and Jacobs replied. (Doc. No. 17).

## II.    BACKGROUND

Seldon, an African American male, worked as a Heavy Equipment Operator for Jacobs Industrial Services, Inc., from February 2010 to September 2015. (Doc. No. 1 at 3). On September 25, 2015, Jacobs informed Seldon that it was terminating his employment for sleeping on the job. (Doc. No. 14-2). Troy Dempster, then the Site Manager at the Jacobs facility in Lima, Ohio, made the decision to fire Seldon after being told by the night shift supervisor, Kevin Collins, that Collins had caught Seldon sleeping during the September 24 overnight shift. (Doc. No. 14-3 at 2). When Collins reported this to Dempster, Dempster responded by asking where Seldon was. Collins told him Seldon had left work and had been seen threatening to head to the union hall to file multiple

grievances over working conditions. (*Id.*). Immediately after hearing this, Dempster made the decision to terminate Seldon's employment. (*Id.*). Seldon did not actually file any grievances with the union that day.

Seldon was informed of his termination when a secretary from Jacobs called him on September 25. (Doc. No. 14-2 at 12). Seldon, who had just left the union hall, went back to determine his next steps and was eventually told by a union employee that he should go in to work as scheduled because the secretary did not have the authority to fire him. (*Id.* at 12-13). Seldon returned to work that evening but was stopped at the gate when his card did not work. (*Id.* at 13). While there, Seldon further inquired about his termination and Collins was called down to the gate to explain things to Seldon. (*Id.*). Collins told Seldon that he was fired because Collins saw him sleeping on the job the night before, at which point Seldon denied he had been sleeping. (*Id.*).

Seldon filed a grievance a few days later, on October 2, 2015. (Doc. No. 14-6 at 2). Although that grievance form does not mention race discrimination, Seldon testified that he attempted to include allegations of discrimination and the union informed him that complaints of that nature were not within their scope. (Doc. No. 14-2 at 23-24).[1]

On January 20, 2016, Seldon filed a charge with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination and retaliation. (Doc. No. 1-1). The OCRC issued a "No Probable Cause" determination and dismissed the charge on November 17, 2016. (Doc. No. 14). The EEOC issued a "Dismissal and Notice of Rights" on January 10, 2017, in which it adopted the findings of the OCRC. (Doc. No. 1-2). Seldon filed this suit on April 10, 2017, alleging race discrimination, a hostile work environment, and retaliation, all in violation of federal and Ohio law. (Doc. No. 1).

---

[1] Seldon's grievance was eventually denied by a hearing committee on August 9, 2016. (Doc. No. 14-7).

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. DISCUSSION

#### A. Race Discrimination

Seldon's first three claims are for race discrimination in violation of Title VII, Section 1981, and Ohio law. Although his claims are brought under different statutes, they can all be analyzed using the same framework.

"The elements of a *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981." *Tennial v. United Parcel Serv.*, 840 F.3d 292, 302 (6th Cir. 2016) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000)). Also, because Title VII case law is "generally applicable" to claims asserted under O.R.C. § 4112.02, both the federal and corresponding state law claims will be analyzed under the same standard as well. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

"[A] plaintiff can prove racial discrimination by proffering either direct evidence or circumstantial evidence." *Tennial*, 840 F.3d at 302 (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65

3

(6th Cir. 2003)). Because Seldon attempts to prove his claims through circumstantial evidence, the burden-shifting framework from *McDonnell Douglas* and its progeny governs the analysis. *Tennial*, 840 F.3d at 303 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Under that framework, the burden of production is first on the plaintiff to put forth a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). If the employee does so, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 252 (quoting *McDonnell Douglas*, 411 U.S. at 802). To survive a motion for summary judgment, the plaintiff "need not definitively prove that [the employer's] reason is pretextual, but rather 'must prove only enough to create a genuine issue as to whether the rationale is pretextual.'" *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)).

1. **Seldon's Prima Facie Case**

To establish a *prima facie* case, Seldon must show he was:

> (1) a member of the protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees.

*Tennial*, 840 F.3d at 303 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

Seldon alleges he (1) is an African-American male who (2) was fired (3) from a position he was qualified for[2] and (4) replaced by a Caucasian employee. (Doc. No. 1 at 1-4).

Jacobs does not present evidence to dispute any of these points. Instead, Jacobs contends that Seldon cannot establish a *prima facie* case because he cannot show that he was treated less favorably than his nonminority coworkers or that his termination was based on his race. (Doc. Nos.

---

[2] Seldon worked as an operator for Jacobs for over five years and Jacobs presents no evidence or argument that Seldon was not qualified to perform that role.

4

14 at 13 & 17 at 6). This argument fails because it conflates the burden of persuasion plaintiffs have in Title VII actions with the burden of production required for plaintiffs to move to the second step of the *McDonnell Douglas* framework.

First, Seldon does not have to show he was treated less favorably than his nonminority coworkers to establish a *prima facie* case. While that is one way to prove the fourth element, plaintiffs can satisfy this element by showing they were replaced by someone outside the protected class—as Seldon did here.

Second, although Seldon at all times has the burden of persuading the trier of fact that Jacobs terminated his employment on the basis of race, Seldon does not have to show this to meet his burden of production at the first step of the *McDonnell Douglas* framework. As the Supreme Court explained: "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr.*, 509 U.S. at 506 (quoting *Burdine*, 450 U.S. at 254).

But this presumption does not establish that Plaintiff in fact has a successful claim. Instead it "raises an inference of discrimination . . . because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). If, as Jacobs seems to argue here, this stage of the analysis required plaintiffs to show they were, in fact, discriminated against because of their race, then it would serve no role at all because it would merely restate the ultimate inquiry.

2. **Jacobs' Legitimate Non-Discriminatory Reason**

Because Seldon established a *prima facie* case of race discrimination, the burden shifts to Jacobs to come forward with legitimate non-discriminatory reasons for his termination. "To meet this burden, 'the defendant must clearly set forth, through the introduction of admissible evidence,

5

the reasons' for its decision." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (quoting *Burdine* 450 U.S. at 255).

Here, Jacobs claims Seldon was fired for falling asleep on the job, a violation of Jacobs' policy justifying immediate termination.

    3. **Pretext Analysis**

Seldon denies that he was sleeping at work and argues that Jacobs is using the report that he was sleeping as pretext for discrimination.

"Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

But as *Chen* further explained, these are not meant to operate as rigid categories; instead "[p]retext is a commonsense inquiry: did the employer fire the employer for the stated reason or not?" *Id.* at 400 n.4. "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515). "[A] reason cannot be proved to be 'a pretext for *discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original).

The pretext analysis requires me to lay out in greater detail the series of events leading up to Seldon's termination. On September 23, 2015, two Jacobs employees informed Dempster that they believed Seldon was not refueling equipment when he worked the night shift. (Doc. No. 14-3 at 2). Those employees informed Dempster this belief was based on the fact that when they arrived for the day shift, the equipment had either run out of or was low on fuel. (*Id.*).

One of them, John Wesley, who was also Seldon's union steward at the time, also told Dempster that he had seen Seldon sleeping on the night shift. (*Id.*). Dempster relayed what he was told to the Area Maintenance Supervisor, Robert Sharp, and asked Sharp to speak with Seldon about what had been reported. (*Id.*). Dempster also asked Sharp to have Collins keep an eye on Seldon to make sure that Seldon was handling the fueling duties. (*Id.*). Sharp approached Collins later that day and asked Collins to find out if Seldon was keeping a fuel log. (Doc. No. 14-5 at 1). Collins then approached Seldon and asked him to write down all of the pieces of equipment that he fueled. (Doc. No. 14-2 at 15; Doc. No. 14-5 at 1-2). According to Collins, Seldon became very agitated during that conversation. (Doc. No. 14-5 at 1-2). Seldon testified that he felt he was being accused of not doing his job, but despite this, he complied with Collins's instructions going forward. (Doc. No. 14-2 at 15-16).

Just over a day later, sometime during the September 24 overnight shift, Collins attempted to reach Seldon regarding a fueling operation. (Doc. No. 14-5 at 2). Here, the parties present significantly different stories of what occurred that night.

According to Jacobs, Collins called Seldon over the radio several times before driving to a fuel tank where he saw Seldon's truck. (Doc. No. 14-5 at 2). Collins testified that he drove towards Seldon's truck with his own truck's backup alarm sounding and slammed his truck door after he parked near Seldon's, but that there was no movement from Seldon, leading Collins to believe that Seldon was asleep. (*Id.*). Collins then approached the front of Seldon's truck and saw him "sound asleep in the front seat of the truck." (*Id.*). Collins testified that he spoke Seldon's name multiple times, each time louder than the last, and that Seldon did not wake up until the fourth time. (*Id.*). Collins then asked Seldon if he was awake and Seldon replied that he was. (*Id.*). Collins proceeded to assist Seldon with some fueling operations, during which he asked if Seldon was okay and Seldon replied that he was. (*Id.*).

7

According to Seldon, Collins approached him while he was resting with his head back and his eyes closed, but Seldon opened his eyes and turned his head towards Collins as Collins drew near. (Doc. No. 14-2 at 16). Seldon testified that he had been resting his eyes because they were burning from fueling equipment that night. (*Id.*). Collins told Seldon that he had been trying to reach him on the radio, and Seldon responded by asking Collins to try calling him again because Seldon's radio was right next to him on the seat. (*Id.*). Collins tried calling again but no sound came through the radio. (*Id.*). After this, Seldon fueled the piece of equipment that Collins needed fueled and then continued with his shift. (*Id.*). Seldon denies that Collins ever asked if he was sleeping. (*Id.*).

Seldon then proceeded to tell a number of coworkers he was not feeling well that night. (*Id.* at 16-17). One of them, Mike Ehrensberger, recommended that Seldon go grab aspirin from his office. (*Id.* at 16). On the way to Ehrensberger's office, Seldon saw Collins and told him that he was not feeling well and was going to grab aspirin and wash his eyes out. (*Id.*). Seldon then completed a hazard report in which he stated: "Diesel fumes heavy in some areas, burning eyes causing headache. Try to stay upwind, washed eyes out, stood in front of fan, took aspirin." (*Id.* at 17).

The following day, Collins approached Dempster and told Dempster he had seen Seldon sleeping during the night shift. (Doc. No. 14-3 at 2). Collins further detailed the encounter, explaining that Seldon had not responded to Collins' radio calls, the sound of Collins' truck door slamming, or Collins calling Seldon's name as he approached. (*Id.*). Collins also told Dempster that Seldon was seated in the front of the truck when he should have been securing the nozzle at the tank of the truck. (*Id.*). Dempster then asked Collins where Seldon was and Collins informed him that Seldon had already left work and that, before he left, he had been seen threatening to head to

8

the union hall to file multiple grievances. (*Id.*). Dempster made the decision to terminate Seldon's employment. (*Id.*).

Jacobs' company policy includes a non-exhaustive list of infractions that may result in disciplinary action, up to and including termination of employment. (Doc. No. 14-3 at 10). Unauthorized sleeping is one of the infractions on this list. (*Id.*). Dempster notes that two weeks prior to Seldon's termination, a Caucasian employee was terminated for sleeping on the job. (*Id.* at 3).

Seldon does not dispute that unauthorized sleeping warrants termination. Instead, Seldon argues that he was not actually sleeping, and that he only appeared to be sleeping because the fumes were causing him to have issues with his eyes. (Doc. No. 16 at 17). In response, Jacobs invokes the honest-belief rule, contending that even if Seldon was not sleeping, it is entitled to summary judgment because Dempster honestly believed that Seldon was.

Under the honest-belief rule, "an employer is entitled to 'summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.'" *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 591-92 (6th Cir. 2014) (quoting *Chen*, 580 F.3d at 401). "'[A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)) (original brackets omitted).

"In determining whether an employer 'reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Wright v. Murray Guard, Inc.*,

455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)) (further citation omitted).

Seldon, relying on *Yazdian v. ConMed Endoscopic Technologies*, 793 F.3d 634, 653-54 (6th Cir. 2015), argues that Jacobs did not reasonably rely on particularized facts because it did not give Seldon the opportunity to present his side of the story. But Seldon's reliance on *Yazdian* is misplaced because it was more than simply the failure to interview the employee that led the court in *Yazdian* to conclude the honest-belief rule did not apply. For example, the employer in *Yazdian* had before it a letter with the employee's version of the events at issue and despite this, the employer made its decision without even reading that letter. *Yazdian*, 793 F.3d at 654.

Jacobs, by contrast, did not go out of its way to ignore any evidence that it already had. Further, the employer is not required to hear from the employee in every case. *See Bowie v. Advanced Ceramics Corp.*, 72 F. App'x 258, 263-64 (6th Cir. 2003) (affirming summary judgment to employer where it was reported employee was sleeping even though employer did not ask for employee's version of events before taking the adverse action).

Here, Dempster had the following facts before him when he made his decision: Dempster was approached by two Jacobs employees just days prior to the report that Seldon was sleeping. Those two employees complained to him that equipment was not being appropriately fueled during the night shift. One of those employees, Wesley, even told Dempster that he had seen Seldon sleeping during the night shift. Rather than rely on this alone, Dempster asked Sharp and Collins to look into the matter further. Just over a day later, Collins reported back to him that he had caught Dempster sleeping during the September 24-25 night shift.

Even drawing all factual inferences in Seldon's favor, a reasonable jury, examining the record in its entirety, could come to only one conclusion: that Dempster made a reasonably informed and considered decision before firing Seldon. Therefore, the honest-belief rule applies, and the pertinent

10

question is not whether Seldon was actually sleeping that day, but instead whether Dempster honestly believed that he was.

In much of my analysis above I have already addressed this point, but Seldon raises an additional argument here as well: Jacobs could not have honestly believed that Seldon was sleeping on the job because he made several comments to other workers which, along with a hazard report that he filed, indicate that he was suffering from a headache and had issues from fuel fumes burning his eyes. This argument fails because Seldon offers no evidence that Dempster was aware of these comments when he made his decision.

Finally, I note that even if Jacobs' investigation was not perfect, Seldon must show not only that the reason for his firing was false, but also that the reason was pretext *for discrimination*. *See St. Mary's Honor Ctr.*, 509 U.S. at 515. On this point, that Jacobs fired a Caucasian employee for sleeping two weeks prior to firing Seldon is relevant, and there is no evidence this employee was afforded any more of an opportunity to respond to the allegations against him than Seldon.

In sum, while Seldon was able to establish a *prima facie* case of race discrimination, Jacobs has come forward with a legitimate non-discriminatory reason, and Seldon fails to provide evidence from which a reasonable jury could find that this reason was pretext for discrimination.

**B. Hostile Work Environment Harassment**

Seldon also brings hostile work environment claims under both Title VII and Ohio law. To establish his claim, Seldon must show:

> (1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999)). Jacobs contends Seldon's claims must fail

because he cannot establish he was subjected to conduct that was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment and, to the extent he reported alleged harassment, Jacobs took prompt and appropriate remedial action. (Doc. No. 14 at 14-15).

Seldon claims he reported the following specific incidents of harassment to managers at Jacobs: in 2011 two co-workers hung a noose from the mirror of a company truck and on at least one occasion made a derogatory remark about his race; three different occasions where co-workers made race-related jokes; coworkers played a radio station at work that made racial jokes on air; and co-workers discussed racial issues in front of him, including one occasion where a co-worker, speaking about the killing of Trayvon Martin, said that if somebody had come into their neighborhood they would have shot them too. (Doc. No. 16 at 21).

Seldon also testified to a number of incidents of harassment that were not overtly racial, but that he claims happened because of his race. These include: one of his co-workers putting his foot on Seldon's chair while Seldon used the microwave; one of his co-workers referring to him as a "super operator" rather than calling him by name; white employees asking him about going over to Dempster or another supervisor's house all the time; a white supervisor calling him "brother" or "cousin"; other employees blaming him for making a labor supervisor quit; not being assigned to operate the 50-ton crane while other, white and less experienced employees were; and someone cutting a hole in a jacket that he borrowed from Dempster, removing the Jacobs logo from the jacket. (Doc. No. 14-2 at 32-33, 36-38).

At the outset, the 2011 incident must be analyzed separately from the rest of the allegations because Jacobs took appropriate action to address the incident. (Doc. No. 14-3 at 1, 4-7). Seldon himself testifies that Jacobs was prepared to fire the two employees who engaged in the harassment until Seldon insisted otherwise. (Doc. No. 14-2 at 29-30). Further, Seldon testified that neither of

12

those employees has made any racially derogatory comments to him since then. Because no employer liability can attach to this incident of harassment, I will not consider it going forward.

The question then is whether the remainder of Seldon's allegations are sufficient to survive summary judgment. In analyzing the allegations, I start by determining whether the alleged incidents of harassment are based on race. *See Williams,* 643 F3d at 511 ("[t]he third element limits the scope of this analysis: only harassment *based on the plaintiff's race* may be considered.") (emphasis in original) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)).

The race-related jokes that Seldon overheard clearly qualify as based on race. A reasonable jury could also find that discussing the killing of Trayvon Martin, in the way Seldon alleges his co-worker did, is also harassment based on race. As for the incidents which were not explicitly race-based, like the time one of his co-workers cut the Jacobs logo out of his jacket, it is enough at this stage that Seldon presents circumstantial evidence sufficient for a reasonable jury to conclude his race was the reason he suffered that harassment. Seldon was the only African American operating engineer at this location, (Doc. No. 14-2 at 7, 36), and he was the only employee to receive this treatment. At this stage, drawing all inferences in his favor, this is enough for a reasonable jury to conclude the harassment was based on his race.

Because Seldon presents enough for a reasonable jury to conclude the alleged harassment was based on his race, the next issue is whether the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *See Harris*, 510 U.S. at 21. Although "whether conduct is severe or pervasive is 'quintessentially a question of fact,'" *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)), the Sixth Circuit has held summary judgment is appropriate where "as a matter of law, the conduct complained of was not sufficiently severe or pervasive." *Clay*, 501 F.3d at 707 (further citations omitted).

13

At this stage, "[f]actors to consider include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Williams*, 643 F.3d at 512 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). In doing so, I am mindful that the Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017).

The relative infrequency of the harassing conduct counsels against finding it was sufficiently severe or pervasive. *See Phillips*, 854 F.3d at 328 (no hostile work environment where plaintiff was only able to specifically identify a handful of offensive incidents over the course of two years) (collecting cases). Seldon worked at Jacobs for over five years, but points to only a handful of specific incidents of harassment. At times in his testimony, Seldon references experiencing harassment on a regular basis, (Doc. No. 14-2 at 31-32), but he fails to substantiate those allegations with more-specific instances. Seldon must provide more than conclusory allegations that harassment occurred on a regular basis. *See Fuelling v. New Vision Med. Labs., LLC*, 284 F. App'x 247, 259-60 (6th Cir. 2008).

The nature of the harassment also counsels against finding it was sufficiently severe or pervasive. While racial harassment of any sort is shameful and unacceptable conduct, the law in this area distinguishes between a "mere offensive utterance" and conduct that is "physically threatening or humiliating." *Harris*, 510 U.S. at 23. The harassing acts that Seldon alleges are despicable, but none of them rises to the level required for a hostile work environment actionable under Title VII. *See Williams*, 643 F.3d at 513 (affirming grant of summary judgment where supervisor called Jesse Jackson and Al Sharpton "monkeys" and said black people should "go back to where [they] came from"); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (affirming grant of

14

summary judgment where supervisor stood behind plaintiff and made a noose out of a telephone cord).

In sum, while Seldon's allegations, if true, are troubling, they do not rise to the level required to establish a hostile work environment actionable under Title VII.

**C. Retaliation**

Seldon asserts retaliation in violation of both federal and Ohio law. The same analysis applies to both claims. *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 827 n.2 (6th Cir. 2019). Title VII's anti-retaliation provision prohibits employers from discriminating against any employee because that employee "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3.

Because Seldon attempts to prove his retaliation claims through circumstantial evidence, they are subject to the same burden-shifting framework from *McDonnell Douglas* and its progeny that I used to analyze his claims for race discrimination. *See Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

1. **Prima Facie Case**

To establish a *prima facie* case of retaliation, Seldon must show:

> (1) [he] engaged in activity protected by Title VII; (2) [his] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) (further citation omitted). The first, second, and fourth prongs are at issue here.

### a. Protected Activity

Seldon clearly engaged in protected activity when he reported the racial harassment in 2011, but he does not contend that he was fired in retaliation for reporting that incident. Instead, Seldon claims he was retaliated against for reporting racial harassment to Dempster and informing Wesley that he intended to file a grievance with the union over working conditions. (Doc. No. 16 at 23). Jacobs argues Seldon's stated intention of filing a grievance does not constitute protected activity because his grievance was not linked to any alleged discrimination. (Doc. No. 17 at 13).

"The opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citing *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012)). At the same time, the terms of the anti-retaliation provision require the opposition in question to be opposition to a practice "made unlawful…by this subchapter." *See* 42 U.S.C. § 2000e-3. Because of this, "[a]n employees' complaints . . . constitute protected activity only if they relate to unlawful discrimination." *Smith v. Bd. of Trs. Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 901 (N.D. Ohio 2010).

The issue is whether Seldon's stated intention of filing a grievance is sufficiently related to a complaint of discrimination to constitute protected activity. Seldon testified that he intended to file a grievance over being moved from operating to fueling (and the hours reduction that came with the move) and not having a laborer to assist him with fueling. (Doc. No. 14-2 at 44). None of these working conditions are themselves made unlawful by Title VII.

The context in which Seldon's conduct occurred is also relevant to the analysis. *See Yazdian*, 793 F.3d at 646 ("[A]n employee who complains that an employer is creating a 'hostile work environment' engages in Title-VII-protected activity when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or

treatment."); *see also Crawford*, 773 F. App'x at 827 (explaining that a jury can properly consider the context to determine if an employee is engaged in protected activity). But even taking that into account, Seldon's previous reporting of racial harassment[3] is not enough for a jury to conclude that Seldon stating he intended to file a grievance over working conditions constituted protected activity.

   b. **Jacobs' Knowledge of Protected Activity**

Even if I were to assume that Seldon stating his intention to file a grievance constituted protected activity, Seldon's claim would fail because he has not presented evidence from which a reasonable jury could conclude that Dempster knew or should have known that Seldon's grievance had anything to do with race discrimination. While Dempster may have known that Seldon intended to file a grievance, he did not know the nature of the grievance. (Doc. No. 14-3 at 2). Wesley did not tell Dempster what Seldon planned to file a grievance about, and there is no evidence that Wesley himself should have been aware that Seldon's complaints were in any way related to race.

   c. **Causal Connection**

The Sixth Circuit has held that the fourth prong "requires proof of so-called 'but-for' causation, meaning that the plaintiff must furnish evidence that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Mys*, 886

---

[3] Jacobs argues that Seldon only reported racial harassment once, in 2011, but the record provides evidence from which a jury could conclude otherwise: Seldon testified that on at least one occasion, he told Dempster about the differential treatment he was receiving at work. (Doc. No. 14-2 at 41). Seldon also testified that he believed this treatment was based on his race. (Id. at 42). Dempster once told Seldon that he was not racist, and Dempster sought to prove this by telling Seldon that his family had adopted a black child. (Doc. No. 42-2 at 41). A reasonable jury could conclude from all of this that Seldon had complained to Dempster of racial discrimination and or harassment on some occasion other than his complaint in 2011.

F.3d at 600 (quoting *Nassar*, 570 U.S. at 360); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015) (en banc)).[4]

Close temporal proximity can be enough on its own to establish a prima facie case of retaliation. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014). Here, Seldon relies on the fact that Dempster made the decision to fire him immediately after learning that Seldon was on his way to file a grievance. The extremely close temporal proximity is enough to establish the causal connection needed for his *prima facie* case. *See Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 502 (6th Cir. 2013).

Temporal proximity is not all that Seldon has to support his claim here. Reading the facts in the light most favorable to him, the sequence of events surrounding Dempster's decision to terminate Seldon also supports the conclusion that the termination would not have occurred but for Dempster learning that Seldon had engaged in protected activity.

Consider the following reasonable reading of the record: Dempster, upon being told that Seldon was sleeping at work, asks where Seldon is so that he can bring Seldon in to hear Seldon's side of the story. But then, upon hearing that Seldon was seen threatening to file a grievance, Dempster decides that Seldon is causing more trouble than he is worth and decides to fire him based on the report that he was sleeping. I do not mean to suggest this is what actually occurred. A reasonable jury could also find that Dempster would have fired Seldon anyway, and that Dempster

---

[4] While this is the rule I will apply, I note the tension, which other circuits have recognized, *see Foster v. Univ. of Md.—E. Shore*, 787 F.3d 243, 250-51 & n.10 (4th Cir. 2015), created by applying the but-for causation rule from *Nassar* to the requirements for a *prima facie* case of retaliation. If, in order to make out a *prima facie* case, a plaintiff must provide evidence from which a reasonable jury could find that the protected activity was a but-for cause of the adverse action, then every plaintiff that succeeds at the *prima facie* stage must, by definition, succeed at the pretext stage as well. Despite this, I apply the rule as it exists in the Sixth Circuit and conduct the analysis at each stage in this opinion. *See Adamov v. U.S. Bank Nat. Ass'n*, 681 F. App'x 473, 476-81 (6th Cir. 2017) (applying the but-for requirement to the *prima facie* portion of the analysis and relying on the same information at both the *prima facie* and pretext stages to hold that plaintiff's claim survived summary judgment).

18

only asked where Seldon was so he could locate Seldon to inform him of his termination. But because either of these conclusions are reasonable, Seldon has provided evidence from which a jury could find that he would not have been fired but for the fact that he engaged in protected activity. Seldon has therefore satisfied the fourth prong.

Nonetheless, Seldon's claim for retaliation fails because he fails to meet the requirements of the first and second prongs of the test for a *prima facie* case.[5] Therefore, Jacobs is entitled to summary judgment in its favor on this claim as well.

## V. CONCLUSION

Jacobs' motion for summary judgment is granted.

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge

---

[5] Because I find that Seldon has failed to establish a prima facie case of retaliation, I do not address the parties' arguments on pretext.